723 So.2d 1288 (1998)
Regina E. GEBAUER
v.
LAKE FOREST PROPERTY OWNERS ASSOCIATION, INC.
2970520.
Court of Civil Appeals of Alabama.
November 13, 1998.
Sandra K. Meadows, Mobile, for appellant.
Jay M. Ross of Reid, Friedman, Perloff & Ross, P.C., Mobile, for appellee.
MONROE, Judge.
Lake Forest Property Owners Association, Inc., sued Regina E. Gebauer, claiming that Gebauer's keeping Taylor, her pet Vietnamese potbellied pig, violated the neighborhood's restrictive covenant forbidding livestock. The association asked the court to enforce the restrictive covenant and remove Taylor from the Gebauer home. After a trial, the court found Taylor to be "livestock" and found that her presence constituted a nuisance, and it ordered that the potbellied pig be permanently removed from the neighborhood. Gebauer appealed to the Alabama Supreme Court, which transferred the case to this court pursuant to § 12-2-7(6), Ala. Code 1975.
Gebauer contends that the evidence does not support the trial court's finding that Taylor is livestock; instead, she said, the evidence shows that Taylor is a domesticated pet who should be able to live at home.
Taylor's is a sad, Dickensian tale in which a cold, hard-nosed triumvirate tries everything within its power to separate a woman from the potbellied porcine pet she loves. The story goes like this. Gebauer already owned Taylor when she moved into the Lake Forest subdivision in February 1996. About *1289 a week after Gebauer moved in, the architectural review committee of the Lake Forest Property Owners Association sent her a letter claiming that she had violated the neighborhood's restrictive covenants by putting up a chain-link fence and by keeping a pig in her home.
Robert Segalla, chairman of the three-member architectural review committee, who is also the president of the neighborhood association, was the only person to testify for the association. At trial he said that he had never seen Taylor, and there is no evidence that the two other members of the architectural review committee had ever seen her, either. Segalla acknowledged that even though he had no personal knowledge of Taylor, he helped with a petition to have her removed from the neighborhood. He acknowledged that the three members of the architectural review committee were laymen as far as animal husbandry is concerned, and he said that he knew nothing about the differences between a potbellied pig and a regular farm pig. He acknowledged that another potbellied pig, "Lulu," lived in the neighborhood but that no action had been taken to have her ousted from the neighborhood. Nonetheless, the architectural review committee charged ahead like a wild boar in rutting season, singlemindedly pursuing its quest to have Taylor removed from her home.
Gebauer testified that Taylor is her pet, just like a dog or cat, and that, as often happens with female pets, Taylor has been spayed. At the time of trial, Gebauer had had Taylor for three years. She explained that Vietnamese potbellied pigs are raised in the United States to be pets, not livestock. Their pedigrees are maintained, and purebred potbellies can be registered, as thoroughbred dogs can be. Potbellied pigs like Taylor are far smaller than regular farm pigs, weighing between 75 and 100 pounds when fully grown. Their ears, tails, body hair, and other traits differ from those of farm pigs. Potbellied pigs cannot eat the same feed as farm pigs, and, on doctor's orders, Taylor eats a brand of feed made especially for exotic pigs.
Gebauer submitted a videotape, "A Day in the Life of Taylor." The tape shows Taylor walking around the house, going up and down stairs, eating her treats, getting her belly scratched, and doing tricks like sitting on command and performing some sort of pig dance. Taylor, who Gebauer said is house-broken, is shown going out into the backyard to play. She has an igloo-shaped doghouse lined with handmade afghans, but it appears she sleeps indoors at nightin her own bedroom. Neighborhood dogs can be heard barking in the background of the tape, but with the exception of an oink, oink here and an oink, oink there, Taylor is quiet. There does not appear to be a rambunctious bone in her body.
The literature on potbellied pigs submitted by Gebauer makes it clear that the animals are meant to be kept as pets. Pet stores sell books on how to care for and understand your potbellied pig. The City of Daphne, where Gebauer and Taylor live, has passed an ordinance allowing potbellied pigs to live as pets within the city limits.
Dr. Michael Rehm, Taylor's veterinarian, testified by deposition that potbellied pigs are intelligent, clean animals that "are probably less destructive than a puppy would be." He said that, in his experience, people who have potbellied pigs "rant and rave about how clean they are and how easy to train they are, so I think from that standpoint they are in all classifications a pet." Dr. Rehm said that he believed that the veterinary definition of "livestock" would be "animals that are used for the purposes of consumption," and it made clear that Vietnamese potbellied pigs are not consumption pigs.
Dr. Rehm did say, however, that Vietnamese potbellied pigs and regular farm pigs are both, genetically, swine. The property owners association gleefully wallows in that statement, arguing that because both animals are genetically swine, both must be considered livestock. However, that argument fails to take into account the differences between not only the physical characteristics of the two types of pig, but also the purposes for which the breeds are raised and how humans interact with each breed. Using the neighborhood association's reasoning, one could argue that because terriers and wolves are both genetically canines and housecats and tigers are both genetically felines, terriers *1290 should be treated the same as wolves and housecats should be treated the same as tigers, and that would be ridiculous.
The neighborhood association contends that Taylor's presence violates the following restrictive covenant, which reads in pertinent part:
"No livestock of any description may be kept or permitted on the property with the exception of dogs, cats, and other animals which are qualified household pets, and which do not make objectionable noise or constitute a nuisance or inconvenience to owners of other lots nearby."
"Where the language in a restrictive covenant is clear and unambiguous, it will be given its manifest meaning, but its construction will not be extended by implication to include anything not plainly prohibited. Cox v. Walter, 348 So.2d 454 (Ala.1977). All doubts and ambiguities must be resolved against the party seeking enforcement. Id." Cooper v. Powell, 659 So.2d 93, 94 (Ala.1995). The neighborhood association's restrictive covenants do not define "livestock." Dr. Rehm's definition of "livestock" is that the animal be bred for consumption. There is no evidence in the record to suggest that Vietnamese potbellied pigs are meant to be anything other than pets; they are clearly not meant to be consumption pigs.
This is not a case in which a family is treating a farm animal like a pet, such as Arnold the pig of television's "Green Acres" fame. Gebauer bought a breed of pig that is bred specifically as a pet. The breed is much smaller than a farm pig and differs from a farm pig in several respects. The only "evidence" indicating that Taylor is livestock is the opinion of three menone of them admits he has never seen Taylor, and no evidence suggests the other two had seen her, eitherand none of the three made any attempt to learn anything about Vietnamese potbellied pigs or get any kind of educated opinion as to whether they are considered livestock or pets.
The neighborhood association's restrictive covenants bar livestock. The evidence presented in this case does not support a finding that Taylor is livestock, rather, the evidence shows that Taylor is a household pet. The restrictive covenants do not exclude Vietnamese potbellied pigs as acceptable pets. Therefore, the trial court erred in banishing Taylor from the neighborhood. We note that the trial court also found that Taylor's presence was a nuisance. There is no evidence to support such a conclusion. There is no suggestion in the record that Taylor is loud, that she strays from her fenced-in yard, that she smells, or that she has any other unpleasantness about her.
Taylor and others of her breed may not be the pet of choice for those of us looking for something cute and cuddly. However, it is clear that Gebauer and Taylor have bonded as strongly as Timmy and Lassie. Vietnamese potbellied pigs are pets and pets only, and Taylor cannot be taken from her home on the mistaken belief that she is just an ordinary farm pig.
The judgment is reversed and the cause is remanded for the trial court to enter a judgment consistent with this opinion.
REVERSED AND REMANDED.
YATES, J., concurs.
ROBERTSON, P.J., and CRAWLEY and THOMPSON, JJ., concur in the result.
ROBERTSON, Presiding Judge, concurring in the result.
Under the restrictive covenant at issue, the determinative question is whether this potbellied pig is a "qualified household pet." Alabama law provides that a restrictive covenant on the use of real property "will not be extended by implication or enlarged by construction or include anything not plainly prohibited and all doubts and ambiguities must be resolved against the party seeking enforcement." Riverchase Homeowners Protective Ass'n v. City of Hoover, 531 So.2d 645, 648 (Ala.1988).
In James v. Smith, 537 So.2d 1074 (Fla. Dist.Ct.App.1989), a Florida court applied similar interpretive principles in concluding that two ponies kept by a landowner were "domestic pets" within an exception to an *1291 anti-livestock covenant. 537 So.2d at 1076-77. There is no substantial difference between permitting a "domestic pet" and permitting a "qualified household pet" on real property, and in the absence of evidence indicating that Gebauer's potbellied pig was a nuisance to adjacent owners, I agree that the judgment is due to be reversed. I therefore concur in the result.